IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>          vs.<br><br>RESHARD BENARD<br><br>                    Defendant. | **REPORT & RECOMMENDATION**<br><br>Case No: 2:09-CR-56 DAK<br><br>District Judge Dale A. Kimball<br><br>Magistrate Judge David Nuffer |

Defendant Reshard Benard filed a motion to suppress all evidence obtained as a result of the search and seizure of Benard and his vehicle on January 16, 2009.[1]  The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B).  An evidentiary hearing on the motion to suppress was held May 27, 2010.  Following the hearing, the magistrate judge instructed the government to prepare a summary of facts and a proposed decision.[2]  After the Government filed its memorandum, Defendant filed a response.[3]

---

[1] Motion to Suppress, docket no. 71, filed February 23, 2010; Supplemental Motion to Suppress, docket no. 84, filed April 7, 2010.

[2] Minute Entry, docket no. 89, filed May 27, 2010; Tr. at 108-09.

[3] Proposed Findings of Fact and Conclusions of Law (Government's Memorandum), docket no. 93, filed June 24, 2010; Defendant's Memorandum in Opposition to the Proposed Findings of Facts and Conclusions of Law (Defendant's Memorandum), docket no. 97, filed July 16, 2010.

## FINDINGS OF FACT[4]

**The Traffic Stop**

Roy Contreras is a trooper with the Utah Highway Patrol ("UHP"), currently assigned to the Governor's protection detail.[5]  Contreras has been with UHP for approximately 3½ years.[6]

On January 16, 2009, Trooper Contreras was working as a field trooper.[7]  At approximately 2:15 p.m., while he was in the area of 3300 South State Street, he received a call from Agent Jayson McCleve of the Utah County Major Crimes Task Force ("Task Force").[8]  Contreras knew McCleve and was aware of McCleve's assignment.[9]

In the phone call, Agent McCleve asked Trooper Contreras to conduct a "wall stop" on a vehicle.[10]  McCleve gave Contreras a description of the vehicle–a white Cadillac, Utah license plate number A468RJ–and a description of the driver, a black male.[11]  McCleve also told Contreras that the driver had a history for weapons.[12]

---

[4]The Findings of Fact are taken from the Government's Memorandum which are consistent with the Court's findings at the end of the hearing.  Defendant's Memorandum included a response to the government's facts.  Where appropriate, the court has incorporated Defendant's facts into the discussion portion of this Report & Recommendation.

[5]Tr. at 44.

[6]Tr. at 45.

[7]Tr. at 45.

[8]Tr. at 45.

[9]Tr. at 45-46.

[10]Tr. at 46.

[11]Tr. at 46-48.

[12]Tr. at 46.

The use of the term "wall stop" by Agent McCleve meant that Trooper Contreras was to find his own probable cause for the stop of the vehicle; to attempt to arrest the driver; and then to search the vehicle in its entirety.[13]  In short, in a "wall stop," the goal is to make an arrest and conduct a search, without any information regarding the suspect or vehicle being given by the requesting officers.[14]  Based on McCleve's assignment with the Task Force, Contreras believed that the stop would involve the presence of drugs and weapons.[15]

After receiving the vehicle information, Trooper Contreras ran a check on the suspect vehicle.[16]  According to the information he received, the vehicle was uninsured.[17]  It is a violation of Utah law to drive an uninsured vehicle on public roads.[18]

At approximately 2:22 p.m., Trooper Contreras saw the suspect vehicle heading northbound on 500 East at approximately 3900 South.[19]  Based on the apparent traffic violation of driving without insurance, Contreras initiated a traffic stop on the car.[20]  The vehicle pulled into a driveway of a residence at approximately 3700 South on 500 East.[21]

---

[13]Tr. at 46-47.

[14]Tr. at 47.

[15]Tr. at 47.

[16]Tr. at 48, 61.

[17]Tr. at 48-49, 61-63.

[18]Tr. at 49.

[19]Tr. at 48.

[20]Tr. at 49.

[21]Tr. at 49.

The driver of the vehicle was the defendant, Reshard Benard.

When the vehicle stopped in the driveway, the defendant immediately began to exit from the vehicle.[22] After receiving direction from Trooper Contreras, the defendant got back into the car, and then, when instructed by Contreras, again got out of the car.[23]

The defendant was agitated and upset throughout the stop.[24] The defendant did not appear to be angry and did not express any threats, but was very agitated and upset, and was very talkative.[25]

Based on the information he had received from Agent McCleve as well as the defendant's behavior, Trooper Contreras asked the defendant for consent to pat him down.[26] The defendant agreed.[27] At the time Contreras asked for consent, it was daylight outside and there was constant traffic on 500 East.[28] At the time of the request, Contreras had not handcuffed the defendant nor had he drawn his weapon on the defendant; the other trooper present, Trooper Jensen, was standing away from Contreras and did not draw his weapon or speak to the defendant.[29]

---

[22]Tr. at 85; Ex. 1. This and other citations to the transcript refer to the Court's findings of fact as stated following the presentation of evidence.

[23]Tr. at 86; Ex. 1.

[24]Tr. at 85; Ex. 1.

[25]Tr. at 85-86; Ex. 1.

[26]Tr. at 52, 75-76, 86; Ex. 1.

[27]Tr. at 52, 86; Ex. 1.

[28]Tr. at 58; Ex. 1.

[29]Tr. at 58, 78; Ex. 1.

During the patdown of defendant's left pocket, Trooper Contreras felt something and asked, "Can I take this out?"[30] The defendant agreed and told Contreras the item was Mexican candy.[31] Contreras took the item out of the defendant's pocket and set it aside.[32]

Trooper Contreras then patted down defendant's right pocket and felt something he could not identify through the clothing; the trooper asked, "What's that?"[33] The defendant replied, "weed."[34] Contreras pulled out the item and saw it was marijuana.[35]

Trooper Contreras then took the defendant into custody.[36] The defendant asked the trooper not to take him to jail and Contreras said it was possible defendant would receive a citation for the marijuana.[37]

Whether Trooper Contreras transported the defendant to jail or wrote a citation, it was the trooper's intent to impound the vehicle for no insurance.[38] UHP policy allows a vehicle to be

---

[30] Tr. at 53, 87; Ex. 1.

[31] Tr. at 87; Ex. 1; *see* Tr. at 53.

[32] Trooper Contreras testified that he noticed immediately that the "candy" was held together with a twist tie. (Tr. at 53.) Contreras, who is familiar with this type of Mexican candy, could tell there was not a chocolate-covered marshmallow inside. (Tr. at 53.) Rather, Contreras noticed that the item inside the wrapper was hard, in a ball or block shape. (Tr. at 53.) He did not examine the item further at that time because he was continuing his patdown. (Tr. at 54.) Had the marijuana not been immediately located, the trooper would have turned his attention to the candy wrapper which was later found to contain cocaine. (Tr. at 54-55.)

[33] Tr. at 55-56, 86; Ex. 1.

[34] Tr. at 56, 86; Ex. 1.

[35] Tr. at 56.

[36] Tr. at 54, 56, 88-89; Ex. 1.

[37] Tr. at 57; Ex. 1.

[38] Tr. at 57.

impounded for that reason and also allows a vehicle to be impounded following the arrest of the driver.[39]  By policy, an inventory is done on impounded vehicles.[40]

There was no documentation in the vehicle, and none offered by the defendant, to establish that the vehicle was, in fact, insured.[41]

After the defendant was taken into custody, Trooper Contreras asked if he, the trooper, was going to find anything in the car.[42]  Contreras asked the question to determine if there were items such as knives, guns, or needles which could potentially injure an officer who was searching the vehicle.[43]  Defendant then asked if he could speak with the trooper privately and during that conversation, told the trooper there might be a gun in the vehicle because his girlfriend had a gun and had been driving the vehicle.[44]

During the inventory search of the vehicle at the scene, Trooper Jensen located a loaded gun.[45]  The gun was located in an area of the vehicle which was subject to a routine inventory

---

[39]Tr. at 59.

[40]Tr. at 56.

[41]Tr. at 62; Ex. 1.

[42]Tr. at 56-57; Ex. 1.

[43]Tr. at 57.

[44]Tr. at 88; Ex. 1.

[45]Tr. at 60; Ex. 1.

search.[46]  The vehicle was subsequently moved and the inventory completed at the UHP office in Murray.[47]

While still at the scene, defendant stated to Trooper Contreras, "You said drugs were in that candy wrapper."[48]  Contreras responded affirmatively and then asked, "Do you want me to show it to you?"[49]  The defendant indicated that he did, and after 1-2 minutes, Contreras returned and showed the defendant the suspected drugs in the candy wrapper.[50]  The defendant then made various statements related to the candy.[51]

**The FBI Drug Trafficking Investigation**

In December 2008, the FBI, along with the Utah County Major Crimes Task Force, was investigating a drug trafficker by the name of Gessiel Sanchez who was employed as a manager of Victor's Tires, 3350 South State Street, South Salt Lake.[52]  FBI Special Agent Paul Bingham was in charge of the investigation.[53]  From December 16, 2008 until January 23, 2009, the FBI was authorized to intercept telephone calls on a telephone used by Sanchez who was trafficking

---

[46]Tr. at 60.

[47]Tr. at 59.

[48]Ex. 1.

[49]Ex. 1.

[50]Ex. 1.

[51]Ex. 1.

[52]Tr. at 7-9.

[53]Tr. at 7.

primarily in cocaine and heroin (hereinafter referred to as "Target Telephone #4").[54]  Although not

present when all of the calls were intercepted, Agent Bingham reviewed all of the calls.[55]

On December 16, 2008, the FBI intercepted a telephone call between Gessiel Sanchez

and an unknown individual the FBI referred to as "Tommy."[56]  The call was distinct from other

calls because the call was in English.[57]  Tommy also had a unique accent which made his voice

identifiable.[58]  Tommy also called from a particular telephone number.[59]

Based on the fact that Tommy and Gessiel Sanchez spoke in English, the fact that

Tommy's voice was distinctive and the fact that Tommy called from a recognized phone number,

monitoring agents were able to identify Tommy whenever Tommy spoke to Sanchez on Target

Telephone #4.[60]

The intercepted telephone calls between Tommy and Gessiel Sanchez established that

Tommy purchased cocaine from Sanchez.[61]  For example, on December 16, 2008, Tommy called

Sanchez and said that he'd been trying to call the night before because he needed some "stuff," a

---

[54]Tr. at 8-9, 12.

[55]Tr. at 10.

[56]Tr. at 10-11.

[57]Tr. at 10.

[58]Tr. at 10.

[59]Tr. at 10.

[60]Tr. at 10.

[61]Tr. at 11.

common reference to drugs.[62]  On December 20, 2008, Tommy again called Sanchez and said he needed "two ounces," a reference to quantity of a controlled substance.[63]  Sanchez said he would need one-half hour to get the order together.[64]  Tommy later called back and said he needed three instead of two.[65]

Following other intercepted telephone calls establishing Gessiel Sanchez's pricing for heroin and cocaine, agents were able to determine that Tommy was purchasing cocaine from Sanchez, not heroin.[66]

On December 27, 2008, Tommy called Gessiel Sanchez to complain about the quality of the drugs he had purchased.[67]  Tommy said that he had "cooked" up the product and it "didn't come back 20, it only came back 8."[68]  The use of the phrase "cooked up" referred to Tommy's attempt to convert powder cocaine into crack cocaine.[69]  And his statement that it "didn't come back 20, it only came back 8" was a reference to the poor quality of the cocaine which led to a smaller yield of crack.[70]

---

[62]Tr. at 11-12.  The telephone calls discussed by Agent Bingham during his testimony were not all of the calls intercepted between Gessiel Sanchez and the defendant.

[63]Tr. at 12.

[64]Tr. at 12.

[65]Tr. at 12.

[66]Tr. at 12.

[67]Tr. at 12.

[68]Tr. at 12.

[69]Tr. at 13.

[70]Tr. at 13.

Based on the intercepted calls which involved discussions of drugs, Tommy and Gessiel Sanchez appear to have met for drug deals approximately ten times during the wire interceptions.[71]  It is believed that almost all of the meetings occurred at Victor's Tires, 3350 South State Street.[72]  During approximately five of the meetings, detectives and agents with the Utah County Major Crimes Task Force conducted surveillance.[73]  The meetings were observed following intercepted calls which indicated that Tommy intended to purchase narcotics from Sanchez.[74]

During the surveillance of Tommy's meetings with Gessiel Sanchez, surveillance agents were able to get a license plate for a white Cadillac driven by Tommy.[75]  That license plate was Utah plate number A468RJ.[76]  With that information, agents ran the vehicle registration and found that the car was registered to an individual named Reshard Benard.[77]  With further follow-up, agents found that an individual with that name had a driver's license from the State of Indiana.[78]  A copy of that license was obtained and the photograph on the driver's license was

---

[71]Tr. at 14.

[72]Tr. at 14.

[73]Tr. at 14-15.

[74]Tr. at 15.

[75]Tr. at 15.

[76]Tr. at 15.

[77]Tr. at 15.

[78]Tr. at 15-16.

shown to the surveillance units familiar with the individual known as Tommy.[79]  Those officers

positively identified Tommy as the same individual in the Indiana driver's license which had

been issued to Reshard Benard, the defendant.[80]

A criminal history was also run on Reshard Benard, and agents found he had previously

been convicted in federal court of possession of a firearm in furtherance of drug trafficking, in

violation of 18 U.S.C. § 924(c).[81]

Agent Bingham watched the videotape from the traffic stop of defendant by Trooper

Contreras on January 16, 2009, and positively identified the voice of the defendant as the voice

of "Tommy."[82]

On January 16, 2009, at 11:32 a.m., a telephone call from the defendant to Gessiel

Sanchez was intercepted by the FBI.[83]  In that call, Sanchez said he needed a few more minutes;

defendant said he needed to see Sanchez.[84]  Sanchez again said he needed a minute.[85]  At 11:40

a.m., Sanchez called the defendant.[86]  In that call, the defendant told Sanchez he was going to

bring him a lot of money, specifically $1300, and wanted to know what Sanchez would give him

---

[79]Tr. at 16.

[80]Tr. at 16, 22, 27.

[81]Tr. at 20.

[82]Tr. at 19-20, 23-25.

[83]Tr. at 17.

[84]Tr. at 17.

[85]Tr. at 17.

[86]Tr. at 17.

for that.[87]  Defendant reminded Sanchez that Sanchez had previously agreed to give "them" to

him for "650."[88]  Based on the investigation and other calls which had been intercepted, agents

were aware that $650 was the approximate price Sanchez was charging for one ounce of powder

cocaine.[89]

Gessiel Sanchez then asked the defendant if he wanted "1½ or 2" and defendant replied,

"Don't play with me.  I'm trying to get money together and I'm trying to do something."[90]

Defendant then told Sanchez he wanted "2½" and he would make up the money difference to

Sanchez later.[91]  There was no agreement on this request.[92]  Sanchez then told the defendant that

he needed about an hour and the two men agreed that Sanchez would call when "it" was ready.[93]

Based on the investigation, agents believed that Sanchez needed the time to package or prepare

the drugs.[94]

---

[87]Tr. at 17.

[88]Tr. at 17.

[89]Tr. at 17.

[90]Tr. at 18.

[91]Tr. at 18.

[92]Tr. at 18.

[93]Tr. at 18.

[94]Tr. at 18.

At 12:56 p.m., still on January 16, 2009, Gessiel Sanchez called the defendant and said, "It's ready."[95] Defendant said, "Give me about 15 minutes."[96] At 2:02 p.m., Sanchez again called the defendant, but there was no answer.[97] A short time later, also at 2:02 p.m., Sanchez again called the defendant who said he would be there in five minutes.[98] Sanchez said, "you have three minutes."[99]

Based on Agent Bingham's knowledge of the investigation, he concluded that defendant had ordered two ounces of cocaine from Gessiel Sanchez, that the defendant would pay Sanchez $1300 for the drugs which was to occur at Victor's Tires, 3350 South State Street.[100]

Based on that conclusion, approximately six officers set up surveillance in the area of Victor's Tires, 3350 South State Street.[101] At approximately 2 p.m., defendant was observed arriving at Victor's Tires; he was driving a white Cadillac, Utah license A468RJ.[102] Defendant stayed in the store for approximately five minutes and then left, driving southbound on State Street.[103]

---

[95]Tr. at 18.

[96]Tr. at 18.

[97]Tr. at 18.

[98]Tr. at 18.

[99]Tr. at 18.

[100]Tr. at 19.

[101]Tr. at 19, 28.

[102]Tr. at 28-29, 33-34.

[103]Tr. at 29-30, 33.

Prior to defendant's visit to Victor's Tires, the agents working the case had devised a plan to stop the defendant after he left the business.[104]  Detectives wanted a uniformed patrol officer to conduct a "wall stop" on the car–that is, they wanted an officer to stop the vehicle and arrest the defendant and/or search the vehicle.[105]  The uniformed officer would be advised of the defendant's direction of travel, the vehicle description, and would then be left on his own to try to establish a lawful reason for a traffic stop and/or search.[106]  Agents wanted the wall stop conducted in order to confirm their belief that defendant was, in fact, purchasing illegal narcotics from Gessiel Sanchez.[107]

Agent Jayson McCleve of the Utah County Major Crimes Task Force, who is employed by UHP's Special Bureau of Investigation, was tasked with contacting a UHP trooper to conduct the wall stop.[108]  McCleve wanted a trooper who was good on his feet and knew what he was doing based on the fact that the defendant had a criminal history involving guns.[109]  McCleve was put in contact with Trooper Roy Contreras, who had SWAT experience.[110]  McCleve called Contreras and asked him to conduct a wall stop; he gave Contreras a vehicle description, the

---

[104]Tr. at 30.

[105]Tr. at 30-31.

[106]Tr. at 30-31, 43.

[107]Tr. at 30.

[108]Tr. at 32-33, 39-40.

[109]Tr. at 41.

[110]Tr. at 41-42.

license plate, the direction of travel and a description of the driver.[111]  McCleve also advised Contreras that the driver had a history of weapons.[112]  McCleve did not provide Contreras with any other information.[113]

In a "wall stop," the uniformed officer is not advised of the underlying information known by investigators in order to protect the secrecy of the ongoing investigation.[114] Specifically, in this case, Trooper Contreras was not advised of the information known to the FBI regarding the defendant in order to protect the secrecy of the wiretap on Target Telephone #4.[115]

After the defendant left Victor's Tires and headed southbound on State Street, he turned eastbound on 3900 South where he was sighted and then followed by Sgt. Lane Critser of the Utah County Major Crimes Task Force.[116]  Critser followed the defendant to a 7-Eleven located at the corner of 3900 South and 500 East.[117]  The defendant went into the store and when he came out, he drove northbound on 500 East until he was stopped by Trooper Contreras.[118]

---

[111]Tr. at 42.

[112]Tr. at 42.

[113]Tr. at 43.

[114]Tr. at 31.

[115]Tr. at 31.

[116]Tr. at 33-34.

[117]Tr. at 34.

[118]Tr. at 35.

Defendant was observed continually by surveillance units from the time he left Victor's Tires until he was stopped by Trooper Contreras.[119]

## DISCUSSION

**Lawfulness of the Traffic Stop**

"[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth Amendment] even though the purpose of the stop is limited and the resulting detention quite brief."[120]  Because such a stop is more akin to an investigative detention than to a custodial arrest, it should be analyzed under the principles set forth In *Terry v. Ohio*.[121] Under *Terry*, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[122]  In the context of a traffic stop, an officer may stop a vehicle if he has a "reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[123]

Benard argues that under this standard, Officer Contreras was not justified in stopping and seizing him, and that therefore, the evidence obtained as a result should be suppressed. Specifically, Benard contends that the stop was not based on a reasonable suspicion that a

---

[119]Tr. at 33.

[120]*Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *accord United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995).

[121]*Botero-Ospina*, 71 F.3d at 786; *see Terry v. Ohio*, 392 U.S. 1 (1968).

[122]*Terry*, 392 U.S. at 20.

[123]*Botero-Ospina*, 71 F.3d at 787.

violation had occurred since the message Officer Contreras received in response to the license plate check only recommended that he request proof of insurance. He notes that at the hearing, Officer Contreras conceded that the message did not mean that the vehicle was uninsured; and in fact, it turned out that the vehicle was insured.[124]

Despite Benard's argument, however, the court concludes that the message received by Officer Contreras stating that there was no insurance information on file gave rise to a reasonable suspicion that Benard was operating the vehicle without insurance. Thus, the stop of the vehicle was lawful.

**Consent to the Patdown Search**

The government contends that Benard consented to the patdown search, and that therefore, the evidence retrieved was lawfully obtained.[125] Benard, on the other hand, asserts that he did not voluntarily consent to the patdown search.[126]

The court determines the voluntariness of consent to search under the "totality of the circumstances," with the government having the burden of proof.[127] For consent to be valid, two conditions must be met: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was

---

[124]Defendant's Memorandum at 5-7. Defendant's memorandum does not have page numbering, so the court has cited to the page numbers displayed when the memorandum is viewed electronically.

[125]Government's Memorandum at 15-17.

[126]Defendant's ;Memorandum at 10-11.

[127]*United States v. Orrego-Fernandez*, 78 F.3d 1497, 1505 (10th Cir. 1996); *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993).

given without duress or coercion, express or implied."[128]  To satisfy the first prong of the voluntariness requirement, the consent need not be verbal, but may be shown "through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."[129]

In considering the second prong, whether consent was given under coercion or duress, the defendant's custodial status is only one factor to be taken into consideration in the totality of the circumstances analysis.  It is well-established that a person being detained, or even under arrest, may give valid consent.[130]  Thus, the fact of detention is an item to be considered, but it is not dispositive.[131]  Courts have identified several factors that might lead a reasonable, innocent person to believe that he is not free to ignore an officer's request:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.[132]

Benard contends that his consent was coerced.  He notes that prior to eliciting consent, Trooper Contreras ordered him to get into his vehicle, ordered him to show his hands, then

---

[128] *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992).

[129] *United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007).

[130] *Orrego-Fernandez*, 78 F.3d at 1505; *United States v. Soto*, 988 F.2d 1548, 1557-58 (10th Cir. 1993)(citing cases); *United States v. Freeman*, 816 F.2d 558, 562 (10th Cir. 1987)(finding consent voluntary even thought defendant was under arrest).

[131] *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir.1993)(citing cases).

[132] *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996).

ordered him back out of his vehicle. He argues that the authoritative tone of voice used by the officer made it clear that compliance with the officer's commands was compulsory. He states that the repeated use of command language had an obvious emotional impact on him, putting him in a fragile emotional state that affected the remainder of the contact. He also asserts that other coercive factors were in play during the patdown. For example, other uniformed officers were present including Trooper Jensen and a county deputy. These officers were armed although there weapons were not drawn. He also asserts that Trooper Contreras made physical contact with him from the time he was ordered out of the vehicle. He further argues that although members of the public were briefly present, Trooper Contreras ordered them back into their home, thus robbing him of the comfort of family and friends during the encounter, and evidencing the trooper's control of the situation. Benard therefore argues that his consent to the search was not voluntary, but was given in fear, as he felt that he had no choice but to comply.[133]

Using the Tenth Circuit factors as a guide, the court concludes that Benard's consent to the patdown search was valid. While it is true that Trooper Contreras used an authoritative tone of voice, he did not use aggressive language or a threatening tone, did not draw his weapon, or manhandle Benard. Further, the search was conducted on a public street in broad daylight, with traffic on the street and residents of the home watching. Although Trooper Jensen was present, he did not draw his weapon and did not approach Benard during the search. Accordingly, under the totality of the circumstances, the patdown search was voluntary, and therefore, lawful.

---

[133]Defendant's Memorandum at 11.

**Scope of the Patdown Search**

Benard states that the patdown search exceeded the scope of a *Terry* search by pulling items from his pockets which obviously were not weapons.[134]  It is undisputed, however, that when Trooper Contreras felt the "Mexican candy" in Benard's pocket, he asked if he could take it out and Benard consented.[135]  Thus, there was no illegality in the removal of the "Mexican candy" from Benard's pocket.  Next, Officer Contreras felt something in Benard's right pocket and Benard stated that it was "weed," and he was getting ready to smoke it.[136]  Benard's admission that he possessed marijuana gave Trooper Contreras probable cause to believe that Benard had committed a crime.  He therefore lawfully removed the marijuana from Benard's pocket and placed him under arrest.

**Failure to Give *Miranda* Warnings During the Patdown Search**

Benard argues that the trooper was required to give *Miranda* warnings during the patdown search, and that therefore, the evidence obtained, including the marijuana in his pocket, should be suppressed.[137]  *Miranda* warnings are required before a defendant may be subjected to custodial interrogation.[138]  However, *Miranda* warnings generally are not implicated during a

---

[134]Defendant's Memorandum at 13.

[135]Tr. 52-53, 87; Ex. 1.

[136]Tr. at 56.

[137]Defendant's Memorandum at 11-13.

[138]*Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

routine traffic stop unless a level of force was used that would be more associated with a formal arrest.[139]

In this case, Trooper Contreras asked Benard about the contents of an item in Benard's pocket which he felt during the patdown. However, as the government argues, there was no coercion in the question. Trooper Contreras conducted the patdown by himself without applying physical pressure beyond the minimal amount required for the patdown. The trooper did not display a weapon, and the questioning occurred in the driveway of the residence in plain view of the public.[140] Under the circumstances, the court concludes that no *Miranda* warning was required. Therefore, Benard's statement that he had "weed" in his pocket is admissible.

**Admissibility of Benard's Post-Arrest Statements**

Benard contends that his post-arrest statements are inadmissible because he did not receive any *Miranda* warning.[141] After Benard was in custody, Trooper Contreras asked him if there was anything in the car. Benard responded that he would like to speak with Contreras in private. Benard then told Contreras that there might be a gun in the car, because his girlfriend, who owned a gun, had been driving it. Later, Benard asked Contreras about a statement he had overheard concerning drugs found in the candy wrapper. After Contreras showed Benard the drugs, he made several statements regarding the Mexican candy.

---

[139]*United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993).

[140]Government's Memorandum at 19.

[141]Defendant's Memorandum at 13-14.

As discussed above, *Miranda* warnings are only required when a defendant is subjected to custodial interrogation.  The court agrees with the government that although Benard was in custody when he made the statements, they were not the product of interrogation.  "Interrogation" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[142]  Regarding the question concerning the vehicle, Trooper Contreras was not trying to elicit an incriminating response, but rather was concerned about officer safety.[143]  Trooper Contreras did not initiate the conversation about the drugs in the candy wrapper; rather Benard brought up the topic himself.  The court concludes therefore that Contreras's statements were not of a type that he should reasonably have known would produce an incriminating response.  Accordingly, Benard's post-arrest statements are admissible.

**Search of the Vehicle**

Benard contends that the search of his vehicle was illegal.[144]  He argues that the search was not permissible as a search incident to arrest because at the time of the search, he was handcuffed away from the vehicle.[145]  The government asserts that the search of the vehicle was an inventory search incident to its impoundment as a result of Benard's failure to provide proof

---

[142]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[143]Tr. at 56-57.

[144]Defendant's Memorandum at 14-15.

[145]*See Arizona v. Gant*,129 S. Ct. 1710, 1723 (2009)(holding that police may search a vehicle incident to arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or ir is reasonable to believe the vehicle contains evidence of the offense of arrest.").

of insurance as well as a search incident to his arrest.[146]  Benard contends that the vehicle should not have been impounded and thus not subjected to an inventory search because the vehicle was legally parked on private property at a friend's residence.  Benard asserts that Trooper Contereas should have given Benard's girlfriend, who had arrived at the scene, the opportunity to prove that the car was insured and then should have released the car to her without impounding, searching, or inventorying the vehicle.[147]  However, as the government contends, UHP policy allowed the vehicle to be impounded for lack of insurance which Benard had failed to provide, and also because Benard was under arrest.[148]  Accordingly, the inventory search which led to the discovery of the firearm was legal.[149]

**Search of the Candy Wrapper**

In one final argument, Benard contends that the search of the candy wrapper was unlawful because it was done without consent or a search warrant[150]  However, the candy wrapper was searched after Benard was under arrest.  The Supreme Court has allowed officers wide latitude in searches incident to arrest including the opening of packages found on the person during a patdown search.[151]  Accordingly, the search of the candy wrapper was lawful.

---

[146]Government's Memorandum at 19, footnote 5.

[147]Defendant's Memorandum at 14.

[148]Tr. at 59.

[149]*United States v. Hinson*, 585 F.3d 1328, 1335 (10th Cir. 2009); *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003)(stating that inventory searches are "a well-defined exception to the warrant requirement.") ,

[150]Tr. Defendant's Memorandum at 15.

[151]*See United States v. Robinson*, 414 U.S. 218 (1973)(officer discovered heroin in a cigarette package in the defendant's pocket during a patdown search following arrest for suspended driver's license); *Gustafson v Florida*, 414 U.S. 260 (1973)(officer found marijuana cigarettes in a cigarette box during patdown search after arrest for

**The Collective Knowledge Doctrine**

The government contends that even if Trooper Contreras had no independent reason for the stop, arrest, and search, the drugs found on Benard and the gun found in the vehicle would still be admissible under the "collective knowledge doctrine."[152]  There are two categories within the collective knowledge doctrine:  horizontal collective knowledge and vertical collective knowledge.[153]  Vertical collective knowledge exists when "one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action."[154]

The government asserts that in this case there was vertical collective knowledge between the FBI/Utah County Major Crimes Task Force agents and Trooper Contreras.  Thus, the knowledge those agents had concerning Benard's drug trafficking activities, including probable cause to believe that there were drugs in Benard's white Cadillac  could be imputed to Trooper Contreras.[155]  As the government contends, the officers working the wiretap of Gessiel Sanchez had significant information establishing that an individual known to them as "Tommy" who was positively identified as Benard, had been purchasing cocaine at Victor's Tires.  The officers had intercepted a number of phone calls between the two men in which drug transactions were discussed.  The amounts and prices discussed confirmed that the drug in question was cocaine, a

---

defendant's failure to have his driver's license in his possession).

[152]Government's Memorandum at 21.

[153]*United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

[154]*Id.*

[155]Government's Memorandum at 21.

fact that was corroborated by an intercepted call in which Benard complained about the quality of the product because he was having trouble "cooking" it into crack cocaine.[156]

Benard argues that the search and seizure could not be based upon the collective knowledge doctrine because the officers had insufficient information to determine that Benard was "Tommy" or that he was buying drugs at Victor's Tires. Benard notes that he was observed at Victor's Tires, actually buying tires and later placing them on his Cadillac. He contends, therefore, that the officers' surveillance only established that he was a legitimate customer of Victor's Tires. He further points out that voice comparisons were done after the January 16, 2009 traffic stop.[157]

The court disagrees that the officers had insufficient information to provide probable cause to believe that Benard was "Tommy" and that he had purchased cocaine at Victor's tires on January 16, 2009. Officers had observed Benard meeting with Sanchez at Victor's Tires on at least five occasions following the intercepted calls.[158] Further, Officers had obtained the license plate number of the Cadillac and determined that it was registered to Benard.[159] They then obtained a copy of Benard's driver's license photo and the surveillance officers positively identified "Tommy" as Benard.[160]

---

[156]Government's Memorandum at 22.

[157]Defendant's Memorandum at 7-8.

[158]Tr. 14-15.

[159]Tr. at 15.

[160]Tr. at 16, 22, 27.

Based on the prior intercepted calls and their training and experience, the officers working the Sanchez case had probable cause to believe that Benard had in fact purchased two ounces of cocaine from Sanchez on January 16, 2009. Consequently, any of those officers would have had probable cause to stop Benard's vehicle as it left Victor's Tires and to search the vehicle for drugs pursuant to the automobile exception to the search warrant requirement.[161] Further, under the collective knowledge doctrine, the officers' knowledge was imputed to Trooper Contreras even though he was not informed of all the facts supporting probable cause.[162] Therefore, the stop, search, and arrest were lawful.

---

[161]Chavez, 534 F.3d at 1345.

[162]*Hinson*, 585 F.3d at 1334 (the fact that arresting officer was not personally aware of facts providing probable cause for arrest was irrelevant officers instructing him to make the arrest had probable cause).

## RECOMMENDATION

The search and seizure at issue were lawful.  Accordingly, Benard's motion to suppress should be **DENIED**.

It is further recommended that pursuant to 18 U.S.C. § 3161(h)(1)(D) and (H), any order of the district judge regarding this Report and Recommendation should exclude from the computation of the Speedy Trial Act, the time from the filing of the Motion to Suppress through the date of entry of the order of the district judge.

Withing 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  The rules provide that the district judge to whom the case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule.  The district judge may accept, reject, or modify the recommended decision, receive further evidence, or re-commit the matter to the magistrate judge with instructions.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

August 16, 2010.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge